STATE v. CLAUDE BLACKWELL.

(Filed 28 May, 1913.)

1. Murder — Self-defense — Reasonable Apprehension — Deceased's Dangerous Character—Evidence.

Upon a trial for murder, where self-defense is relied on, the violent or dangerous character of the deceased may be shown in evidence when there is proof that the deceased knew thereof at the time of the homicide, and there is direct evidence of the facts showing, or tending to show, that the prisoner acted under a reasonable apprehension that his life was in danger or that he was in danger of great bodily harm; or when, owing to the circumstantial character of the evidence, the nature of the occurrence is left in doubt.

2. Instructions—If the Jury Believe the Evidence—Incorrect Expressions—Words and Phrases—Appeal and Error.

An expression in a prayer for special instruction, "if the jury believe the evidence," preliminary to a direction to the jury as to how they should find upon stated phases of the evidence, is not exact, and a refusal to give an instruction thus worded will not be held as reversible error, though when adopted by the court it is not ground for a new trial unless clearly prejudicial.

3. Murder — Self-defense — Reasonable Apprehension—Instructions for Jury.

Where the defense to a charge of murder relied on is that the prisoner, in committing the homicide, was in reasonable apprehension of his life, or of receiving great bodily harm from the deceased, and that the act was committed in self-defense, the reasonableness of this apprehension must be decided by the jury in view of the facts, circumstances, and surroundings as they appeared to the prisoner at the time.

4. Murder—Instructions—Verdict—Harmless Error.

The refusal to give a prayer for special instruction upon the question of murder in the second degree is held not to be reversible error when a verdict for manslaughter is rendered, the error, if any, being rendered harmless by the verdict.

5. Instructions — Contentions of Fact — Statements—Corrections— Notice—Appeal and Error—Practice.

An assignment of error on the ground that the trial judge incorrectly stated to the jury the contentions of fact of the parties will not be considered when it does not appear that it was called to the attention of the court in time for him to have corrected it.

S. *v.* BLACKWELL.

**6. Instructions Substantially Given—Appeal and Error.**

Where the trial judge has fully and properly instructed the jury upon the law applicable to the facts, it will not be held as reversible error that he did not adopt the language of substantially correct instructions tendered by the appellant.

**7. Murder—Self-defense—Instructions—Burden of Proof.**

In this trial for murder, the judge correctly instructed the jury upon the question of self-defense, placing the burden on the defendant to satisfy the jury of every matter of excuse or mitigation, the killing with a deadly weapon having been admitted.

**8. Verdict—Against Weight of Evidence—Motions—Court's Discretion—Practice—Appeal and Error.**

Where under proper instructions and competent evidence the jury have returned a verdict contrary to the truth of the matter, the only remedy is by motion in the court below to set aside the verdict, and the action of the judge thereon is not reviewable on appeal.

HOKE, J., concurring.

APPEAL by defendant from *Webb, J.,* at September Term, 1912, of MECKLENBURG.

The defendant was indicted in the court below for the murder of Dr. Fred Misenheimer, and was convicted of manslaughter. The evidence taken at the trial is very voluminous, covering nearly a hundred closely printed pages, and it will serve no useful purpose even to give a full synopsis of it. The prisoner surely cannot complain if, for the purpose of passing upon his exceptions, we adopt his statement of the facts, as contained in the brief of his counsel. It is a fair and full statement for him, and while it omits reference to some of the evidence, which strengthens the case for the State, it is sufficiently accurate to present the essential facts and the contentions of the respective parties. We may add, though, that it did not appear that, if Dr. Misenheimer had earned a reputation for violence, when drinking, or under the influence of liquor, the prisoner knew of it, but the evidence tended to show the contrary, as his first acquaintance with him was on the night before the altercation in the room took place. The statement of the facts by the prisoner's counsel is as follows: "The

defendant, together with W. L. Langley and C. B. Skipper, were, on 25 May, 1912, occupying a room in the Buford Hotel. Skipper, Porter, Beckman, and Langley had registered for the room. Porter and Beckman left before the trouble started, and were not witnesses to the fight. Skipper had been drinking hard for several days, and was in a very weak condition. Blackwell came into the room on Friday afternoon about 5 o'clock. His room at the Buford Hotel had been assigned by the clerk to some one else, and upon the invitation of Skipper and Langley he went into their room about 6 o'clock that evening. Langley and Blackwell went to the Elks Club, where they met Dr. Misenheimer, who inquired as to the condition of Skipper, who was sick, and volunteered to walk back to the hotel with them. They all came back to the room which Skipper occupied and went to bed about 10 o'clock that night. Langley waked up about 5 o'clock in the morning and waked Misenheimer and Skipper. Blackwell waked up and said he would have to go home, which was Lancaster, S. C., as had been planned the night before. Misenheimer and Skipper took another drink and went back to sleep. Langley stated that he hated to go away and leave Skipper in such a bad condition, and suggested that they wait until the afternoon train. Blackwell agreed to this, and they went back to bed. About 9:30 or 10 o'clock on Saturday morning, Skipper and all of the remainder of the party woke up, and Langley ordered breakfast for all, to be sent to the room. During breakfast, Misenheimer began to abuse Langley. He then asked Langley for $2 to get a quart of whiskey. Langley replied that he had no money of his own except a $50 bill, and the remaining money he had belonged to Skipper. Whereupon Skipper directed Langley to give Misenheimer $2, and Misenheimer wrote a prescription and Langley sent out for a quart of liquor. When the liquor came Misenheimer borrowed a knife from Blackwell to open the bottle with, took a drink, went into the bathroom and got a stick about 2 feet 8¾ inches long and about 1⅜ inches at one end and 1 inch at the other, weighing about 1¼ pounds. This stick is what is commonly known as a 'plumber's churn.' Misen-

heimer took this stick and began beating around the room, chasing Langley and hitting at Skipper. Then Misenheimer took the electric light cord and pulled it down and told Langley he was going to lynch him. He then began to pay attention to Blackwell. At first Blackwell did not at all reply to his attacks except to state, 'Quit that, Doc.; it hurts.' Langley went into the bathroom then to stop his bleeding nose, which had resulted from the encounter with Misenheimer. He states that while he was there he heard three or four licks and heard an oath used. He looked around and Misenheimer was staggering, saying that he was stabbed. The doctor was sent for, and he was taken to the hospital. Blackwell testified that after Misenheimer had finished his attack on Skipper and Langley and had beaten up the room pretty thoroughly with the stick, he came over to the bed where he lay and pulled it down, and then Blackwell arose and got his shirt, and Misenheimer asked him where he was going, using an oath. Blackwell said he was going to dress and get out of the room, and Misenheimer then locked the door and threw the key under the bed and stated, with an oath, that he would knock·the block off the first man that went out of the door. Blackwell then took up his shirt and got his knife off the bed, where Misenheimer had thrown it after using it to open the bottle of whiskey, and put it in his shirt pocket. Later he went after his slippers, which were under the bed. Misenheimer thought he was going to get the key, and said if he did get it he would kill him, and began beating him over the head. He continued to beat him over the head until Blackwell picked up the knife off the floor where it had fallen from his shirt pocket, and struck him with it. Misenheimer was taken to the hospital, and died after lingering several weeks. The defendant then went to Lancaster under the belief that Misenheimer was not seriously hurt, but came back voluntarily when requested by the police. The defendant offered abundant evidence as to his good character, and also showed that he was not the C. C. Blackwell upon whom the State endeavored to fix a bad character. The only eye-witnesses who testified as to the transaction were the defendant, Claud

Blackwell, and the witness W. L. Langley. The defendant offered evidence tending to show that the wound could not be caused by the knife introduced by the State. Upon this point experts disagreed, and there is positive evidence that the knife shown to the jury was the one used."

· The following errors were assigned by the prisoner:

"1. The court erred in refusing to admit evidence of the violent and dangerous character of the deceased while under the influence of whiskey. The error in this is that there was evidence of self-defense, and violent and dangerous character in cases of homicide is admissible when there is evidence of self-defense.

"2. The court refused the prayer of the defendant to instruct the jury as follows: 'If you believe the evidence, the deceased did beat the defendant with a stick and without provocation from him, and was about to strike him again when the defendant stabbed him. And the defendant had a right to resist the assault of the deceased upon him by force, and had a further right to use a weapon to repel the assault, and he was not required to confine himself to his natural force and strength or to retreat, and the only question before you is whether or not he reasonably thought such force was necessary to repel the assault, and if he so thought, you ought to acquit him.'

"3. The court refused the prayer of the defendant to instruct the jury as follows: 'If you believe the evidence, the deceased struck the defendant severe blows several times with a stick, and was attempting to strike him again when defendant stabbed him, and the defendant had a right to stab the deceased at the time if he reasonably thought such stabbing was necessary to prevent the deceased from killing him or inflicting severe bodily harm upon him; such stabbing would not be excessive force under these circumstances, and you should acquit the defendant.'

"4. The court, in its charge, stated the contentions of the defendant erroneously, as follows: 'And the defendant says that he went to the bed to get his shirt, and while he was putting it on, the penknife fell to the floor, and while he was in

the act of getting his knife and putting on the shirt, the deceased again struck him and told him he was going to kill him.'

"5. Among other requests, defendant asked the court to charge: 'If you believe the evidence, the defendant is not guilty of murder in the second degree, and you will so find.' The court refused this charge, and fully defined murder in the second degree to the jury, and left the question to the jury of the guilt or innocence of the defendant of the charge."

The court gave a very clear and elaborate charge to the jury, explaining fully and correctly the different degrees of homicide with reference to the particular facts of the case, and also the contentions of the State and the prisoner, and among other instructions were the following:

"1. The inquiry in this case is whether the defendant is guilty of murder in the second degree or manslaughter, or killed the deceased in self-defense, and, therefore, is not guilty. Although the law raises a presumption that the defendant is guilty of manslaughter, that presumption can be removed by evidence in the case. It is not necessary that the evidence should remove the presumption beyond a reasonable doubt, in order that you should acquit the defendant, but you must be satisfied only that the defendant struck the fatal blow in self-defense. In other words, such satisfaction need not be established beyond a reasonable doubt nor by the greater weight of the evidence, but through and by means of any evidence in the case that causes such satisfaction.

"2. The defendant contends that, at the time the fatal blow was given, he apprehended or believed that the deceased was about to take his life or do him great bodily harm. If that apprehension or belief was a reasonable one, and the defendant acted under the apprehension or belief that he was going to suffer death or great bodily harm, he was justified in killing the deceased, as it would be a case of self-defense, and you will acquit the defendant.

"3. In passing upon the reasonableness of his belief or apprehension, it is not proper or just to the defendant that you should judge him by the circumstances, as you are now sitting and

looking coolly back upon the transaction, in the light of the evidence; but you should put yourselves in the situation of the defendant and surround yourselves with the same circumstances that surrounded him, and then determine whether or not his apprehension was reasonable, if you find that he had such apprehension.

"4. The defendant contends that when he stabbed the deceased, the deceased had stricken him several times with the stick introduced in evidence. He contends that he had requested the deceased to stop beating or striking him, and had made an effort to leave the room in order to escape from the deceased; that he was sitting upon the bed putting on his shoes; that the deceased had locked the door and thrown the key under the bed and threatened to kill any one who went out. Defendant contends that, while he was sitting on the bed, the deceased struck him several times with the stick, against his protest, and while he was in the act of striking him again, he picked up the knife from the floor and stabbed the deceased, and at the time of such stabbing, he (the defendant) had reasonable grounds to believe and did believe, had reasonable grounds to apprehend and did apprehend, that the deceased was about to kill him or inflict great bodily injury upon him. The court charges you that, if you believe these contentions to be true, as heretofore it has charged you, the defendant was justified in stabbing the deceased, and you should render a verdict of not guilty.

"5. So, gentlemen, coming back to the main proposition—what occurred at the time of the stabbing, and what was going on at that time? What was the character of the assault, if any, by the deceased upon the defendant, and what kind of weapon was he using? I repeat, if the defendant has satisfied you that, at the time the defendant struck this fatal blow, he had reasonable grounds to apprehend and did apprehend, reasonable grounds to believe and did believe—taking into consideration the character of the assault and the weapon used—that he was then in imminent danger of death or great bodily harm, and struck under those circumstances, it would be your duty to acquit him and find him 'Not guilty.' If he has failed to so

satisfy you, or if you find that he struck the deceased because he was irritated and mad at him; struck him at a time when he did not have reason to apprehend and did not apprehend, nor reasonable grounds to believe and did not believe, that he was in imminent danger of death or great bodily harm, but struck him because, as I said, he was mad at him; because he wasn't going to take any more from him; struck him because he had been previously stricken with a stick by the deceased, and not because he was in imminent danger of suffering death or great bodily harm, then it would be your duty to find him guilty of manslaughter; and if he struck him with malice, it would be your duty to find him guilty of murder in the second degree."

The court gave these further instructions:

"6. There must be a present impending peril to life, or great bodily harm, either real or so apparent as to create the honest belief in the mind of the defendant that there is an existing necessity to take the life of the person intended to be killed at the time that he attempts to take it.

"7. As I have stated to you, the burden is upon the defendant, he having admitted that he slew the deceased, to satisfy you, not beyond a reasonable doubt, not by the greater weight of the evidence or the preponderance of the evidence, but to satisfy you that at the time he struck this fatal blow that took the life of Dr. Misenheimer, that he was excusable for doing so.

"8. Now, gentlemen of the jury, give this matter your serious consideration. It is important to the State and to the defendant. Take the case and make up your verdict."

As already stated, the defendant was convicted of manslaughter, and after reserving his exceptions, brought the case here by appeal.

*Attorney-General Bickett, Assistant Attorney-General Calvert, and Clarkson & Duls for the State.*

*Caudle & Delaney, Osborne, Cocke & Robinson, and R. S. Stewart for defendant.*

WALKER, J., after stating the case: The plea in this case was self-defense. The prisoner offered evidence to show that

the deceased was a violent and dangerous man when under the influence of liquor, and there was evidence tending to show that he had been drinking just before he was cut with the knife by the prisoner. For the purpose of testing the competency of the proposed evidence, we will, therefore, assume that he was under the influence of liquor at the time he assaulted the prisoner with the stick. There was no offer to show that the prisoner, at the time of the altercation, knew of the alleged character of deceased as a violent and dangerous man. Upon this question, the law of this State is well settled by numerous decisions, however it may be in other jurisdictions, though we believe that the great weight of authority sustains the view of this Court. The general rule prevailing in most of the jurisdictions is that such evidence is not admissible, and in this State such a general rule is well settled, but it is subject to exceptions depending upon the peculiar facts and circumstances of each case. It has been said that these exceptions are now so well defined and established by the current of the more recent decisions that they have assumed a specific formula, and have themselves become a general rule subordinate to the principal one. *S. v. Turpin,* 77 N. C., 473. As at present understood and formulated, the rule may be thus stated: As a general rule, evidence of the character of the deceased is not relevant to the issue in a trial for homicide, and consequently it is not permissible to show his general reputation as a dangerous or violent man; but when there is evidence showing, or tending to show, that the prisoner acted in self-defense, under a reasonable apprehension that his life was in danger, or that he was in danger of great bodily harm, evidence of the character of the deceased as a violent and dangerous man is admissible, provided the prisoner, at the time of the homicide, knew of such character, or the nature of the transaction is in doubt. 25 Am. and Eng. Enc. of Law (2 Ed.), p. 281, 5 *ibid.,* pp. 872 and 873, where many cases are collected in the note which supports the text, and among them are cited *S. v. Turpin, supra; S. v. Hensley,* 94 N. C., 1022, and *S. v. Rollins,* 113 N. C., 722. The reason why it is necessary for the prisoner to have known of the character of the de-

ceased as a violent and dangerous man is well stated by *Justice Bynum* in *Turpin's case, supra,* at p. 477: "Where one is drawn into combat of this nature by the very instinct and constitution of his being, he is obliged to estimate the danger in which he has been placed, and the kind and degree of resistance necessary to his defense. To do this he must consider, not only the size and strength of his foe, how he is armed, and his threats, but also his character as a violent and dangerous man. It is sound sense, and we think sound law, that before a jury shall be required to say whether the defendant did anything more than a reasonable man should have done under the circumstances, it should, as far as can, be placed in the defendant's situation, surrounded with the same appearances of danger, with the same degree of knowledge of the deceased's probable purpose which the defendant possessed. If the prisoner was ignorant of the character of the deceased, then the proof of it would have been inadmissible, because his action could not have been influenced by the dangerous character of a man of which he had no knowledge." In *Hensley's case,* at p. 1032, the Court said on this point: "If the prisoner did not have knowledge of such character of the deceased (for violence), then such evidence would not be competent, because it could not be inferred that he acted upon facts of which he was ignorant." The present *Chief Justice* said in *Rollins' case:* "The evidence of the homicide was not circumstantial, and though the plea of self-defense was set up, it did not appear that the prisoner knew the character of the deceased for violence. Evidence to show such character was, therefore, properly excluded." It is also competent to show the character of the deceased as a violent and dangerous man when the evidence is wholly circumstantial and the character of the encounter is in doubt. The difference in the two kinds of cases is pointed out in *S. v. Byrd,* 121 N. C., 684: "Evidence of the general character of the deceased as a violent and dangerous man is admissible where there is evidence tending to show that the killing may have been done from a principle of self-preservation and, also, where the evidence is wholly circumstantial, and the character of the transaction is

in doubt. We think that threats made by the deceased against the prisoner come under the same rule. If the threats are not communicated to the prisoner, and the character of the deceased is unknown to him, such evidence is not admissible, when offered only to show self-defense, because facts of which the prisoner had no knowledge could have no effect upon his mind. *S. v. Turpin, supra; S. v. Hensley, supra; S. v. Rollins, supra.* But where the evidence is wholly circumstantial, testimony of the violent character and threats of the deceased, even if unknown to the prisoner, are admissible as tending to show the inherent probabilities of the transaction. *S. v. Turpin, supra; S. v. Hensley, supra.* In the latter case the syllabus appears to differ from the opinion. While this principle has been doubted in some cases, we think it is correct and its adoption the only way of reconciling apparently conflicting opinions." See, also, *S. v. Gooch,* 94 N. C., 987; *S. v. Sumner,* 130 N. C., 718; *S. v. Exum,* 138 N. C., 600; *S. v. Baldwin,* 155 N. C., 494; *S. v. Price,* 158 N. C., 641.

Our reference to *S. v. Byrd,* and to the language quoted therefrom, must not be taken as an authoritative statement by us now of the rule where the evidence is circumstantial, for in this case the testimony is not of that character, as the details of the encounter were given in evidence by eye-witnesses, who testified substantially to the same facts. The present case has not been brought within either branch of the rule, for although there was evidence of self-defense, the character of the deceased for violence, if established, was not known to the prisoner, nor was the evidence circumstantial, nor was the nature of the transaction sufficiently in doubt. In no view, therefore, was it relevant to show the character of the deceased.

The instructions requested by the defendant, and the subjects of his second and third assignments of error, were properly refused. We have said that the expression, "if the jury believe the evidence," preliminary to a direction as to how they should find upon such belief, is "inexact" and should be "eschewed" by the judges, though when used it is not ground for a new trial, unless clearly prejudicial. *Sossaman v. Cruse,* 133 N. C.,

470; *Merrell v. Dudley,* 139 N. C., 57. But a judge should not be required to use that form of expression, especially if it will mislead the jury as to their province in passing upon the facts or restrict them in the exercise of their proper function as triers of the facts. The prayers were too strongly worded, and they are further objectionable as leaving the question of reasonable apprehension as to the prisoner's danger entirely too much to him, when it is one for the jury to decide, though in view of the facts, circumstances, and surroundings as they appeared to the prisoner at the time of the homicide. *S. v. Turpin, supra; S. v. Barrett,* 132 N. C., 1005. We thus stated the principle in *Barrett's case:* "The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon; but the jury must form their conclusion from the facts and circumstances as they appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assail him and take his life, or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it may turn out afterwards that he was misled; provided, always, as we have said, the jury find that his apprehension was a reasonable one and that he acted with ordinary firmness." The prisoner must not only have thought that he was in danger of his life or of receiving great bodily harm, but his apprehension must be based on reasonable grounds, to be found by the jury in the manner we have stated, and not by the prisoner. *S. v. Cox,* 153 N. C., 638; *S. v. Kimbrell,* 151 N. C., 702; *S. v. Dixon,* 75 N. C., 275. The law is sufficiently lenient to him when it requires that he should be judged by the facts and circumstances as they reasonably appeared to him. *S. v. Nash,* 88 N. C., 621; *S. v. Gray, ante,* 608. But the principle of law attempted to be invoked in behalf of the prisoner was fully and correctly stated to the jury by the court in its charge. The prayer for instruction as to

murder in the second degree, contained in the fifth assignment of error, is erroneous in itself, in view of the facts; but if it had been correct, the error in refusing it would have been harmless, as the jury did not convict of murder in the second degree, but of manslaughter. *S. v. Yates,* 155 N. C., 450; *S. v. Watkins,* 159 N. C., 480.

The fourth assignment of error is without merit, as there is no substantial difference between the statement of counsel and the charge of the court in respect to the matter. If, by inadvertence, the judge states any contention of counsel erroneously, it should be called to his attention, so that the mistake can be corrected. *Jeffress v. R. R.,* 158 N. C., at p. 223; *S. v. Cox, supra.*

In this case, the judge charged the jury clearly and exhaustively upon every phase of the evidence. He was not bound to adopt the language of the defendant's prayers for instruction, if they had been correct, but could select his own words, provided they correctly expressed the legal principles applicable to the facts. He properly placed the burden upon the defendant to *satisfy* the jury of every matter of excuse or mitigation, the killing with a deadly weapon being admitted. *S. v. Quick,* 150 N. C., 820; *S. v. Yates, supra; S. v. Rowe,* 155 N. C., 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Bradley,* 161 N. C., 290. If the jury have returned a verdict contrary to the very truth of the matter, the only remedy was by motion in the court below to set it aside. We have no jurisdiction to reverse it, or to modify it, for that reason. The jury evidently found that the defendant did not act in self-defense, as explained by the court, when he struck the fatal blow, and therefore convicted him of manslaughter, upon the ground of legal provocation and the sudden heat of passion.

A careful review of the record and case on appeal has disclosed no error in the trial of the case.

No error.

HOKE, J., concurring: I concur in the disposition made of this appeal on the ground that all the eye-witnesses having been examined, there is substantial agreement as to the objective

facts of the occurrence, and their evidence, to my mind, presents an instance where the character of the deceased was only relevant as bearing on the reasonableness of the prisoner's apprehension.  In such case, evidence as to the character of the deceased as a violent, dangerous man, or threats of injury towards the prisoner, can only be received when such character is known or the threats have been communicated.  But I do not assent to the proposition in so far as embodied in the principal opinion, and expressed in several of the authorities cited, that the testimony as to the character of the deceased or of previous threats towards the prisoner, when not made known to him, is only competent in cases which rest upon circumstantial evidence.  On the contrary, I am clearly of the opinion that when there is evidence which tends to make out a case of self-defense, from the testimony of eye-witnesses, and the character of the · transaction is in doubt, evidence of the character of the deceased as a violent, dangerous man, or of threats by him, importing serious menace to the prisoner, are both competent when it may tend to throw light on the occurrence and reveal the same in its true nature.  To illustrate: if A and B have an altercation, and A kills B, on the trial, prisoner offers the evidence of eye-witnesses tending to show a homicide in his necessary self-defense, and that B was in the act of committing a felonious assault with a deadly weapon and with intent to kill; evidence from eye-witnesses, on the part of the State, that no such assault was being made nor any demonstration with a deadly weapon. In such case, testimony that the deceased was a desperado, one who was in the habit of using deadly weapons, or that, a short· time before, he had threatened to kill A, would be evidence of the first importance tending to establish the facts of the occurrence.

Speaking to this question, in *S. v. Baldwin,* 155 N. C., at page 496, the writer, in a *per curiam* opinion, said: "It was insisted, further, that his Honor made an erroneous ruling in excluding· evidence of certain uncommunicated threats of the deceased uttered shortly before the homicide, tending to show animosity towards the prisoner and a purpose to do him serious

bodily harm. It is now generally recognized that in trials for homicide uncommunicated threats are admissible (1) where they tend to corroborate threats which have been communicated to the prisoner; (2) where they tend to throw light on the occurrence and aid the jury to a correct interpretation of the same, and there is testimony *ultra* sufficient to carry the case to the jury tending to show that the killing may have been done from a principle of self-preservation, or the evidence is wholly circumstantial and the character of the transaction is in doubt. *Turpin's case,* 77 N. C., 473; *S. v. McIver,* 125 N. C., 645; Hornigan and Thompson Self-defense, p. 927; *Stokes' case,* 53 N. Y.; *Holler v. State,* Ind., 57; *Cornelius v. Commonwealth,* 54 Ky., 539. In the present case, while there was evidence on the part of the State tending to show that the prisoner fought wrongfully and killed without necessity, there is testimony on his part tending to show a homicide in his necessary self-defense, and the proposed evidence, tending as it did to throw light upon the occurrence, should have been received."

I take this to be the correct and permissible deduction from *Turpin's case, supra,* and the position, in my judgment, is supported by the great weight of authority, many of the decisions being cited in the well prepared brief of the prisoner's counsel, notably *Wiggins v. The People,* 93 U. S., 567; *S. v. Thompson,* 94 Oregon, 46; *S. v. Kelly,* 194 Mo., 300; *S. v. Keener,* 18 Ga., 194; *Williams v. State,* 48 Amer. Rep. (Texas), 239.