Error.

STATE v. GEORGE LOVE.

(Filed 22 January, 1924.)

**1. Homicide—Criminal Law—Evidence Excluded—Instructions—Appeal and Error.**

Where a prisoner was tried for and has been convicted of murder in the first degree, and there was conflicting evidence that he acted in self defense, and further that he had acted premeditatedly and with prior malice, it is reversible error for the trial judge to state as a part of the State's contentions certain evidence as to the prisoner's long continued prior malice he had excluded as too remote; and this error is not cured by a further instruction that the law would attribute the motive of the killing to the present provocation and not to preëxisting malice unless it so appeared from the circumstances.

**2. Same—Constitutional Law.**

In an action involving the crime of murder in the first degree, an instruction that refers to a pregnant circumstance to show the previous malice and subsequent premeditation of the prisoner to commit the act,

as a fact sworn to but which had been excluded from the evidence, is reversible error in denying to the prisoner his constitutional right to confront the witnesses against him, and to submit them to his cross-examination. Constitution of North Carolina, Art. I, sec. 2.

**3. Same—Contentions—Objections and Exceptions.**

The rule that requires an objection at the time ·to an erroneous statement in the charge of the contention of the parties, does not apply on the trial of first degree murder, when such statement includes the assumption of sworn evidence against the prisoner upon the trial, that had been excluded, tending to show previous malice of the prisoner, vitally necessary upon the question of his premeditation.

CLARK, C. J., dissenting.

INDICTMENT for murder tried before *Lane, J.,* at February Term, 1923, of HAYWOOD.

Defendant was indicted for the murder of William Brock deceased, and on issues joined and evidence offered there was a verdict of guilty of murder in the first degree, judgment, and prisoner excepted and appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*J. W. Ferguson and Frank Carter for prisoner.*

HOKE, J. There was evidence on the part of the State tending to show that on Saturday night 13 January, about 10 o'clock, the prisoner followed the deceased going to his home along Pigeon Street in Waynesville, N. C., and at a point not far beyond Shelton Branch, on said street, shot and killed the deceased and that such killing was deliberate and premeditated, and from ill-feeling long harbored by the prisoner towards the deceased. There were also facts in evidence permitting the inference that the homicide was not a premeditated murder, but that deceased, going along the street some distance ahead, turned and came on the prisoner with a threatening exclamation and attitude and the prisoner shot and killed deceased on this sudden and unexpected meeting. It was proved that the fatal shot entered the front just above the heart, ranging back through the body. One R. A. Teague, a witness for the State, testified that he owned a store on Pigeon Street not far from the Shelton Branch; that Brock, the deceased, lived further out on said street beyond a colored settlement, and that George Love lived in said settlement some distance off Pigeon Street; that the ordinary place for George to leave Pigeon Street was just beyond the Shelton Branch, and that the homicide occurred a short distance beyond this, but there were other ways for him to leave Pigeon Street further on. That on the night of the homicide witness was in his store at 10:00

3—187

o'clock p. m., just about his closing time; deceased was in the store sitting by the stove when the prisoner came in, bought a few things, inquired if his wife had bought their groceries yet, and asked witness if she had not done so could he get them in the morning; that a few seconds after prisoner entered Brock left, going towards his home, and soon after the prisoner left; that witness, standing in his doorway, could see the two going along Pigeon Street, the one about twenty-five or forty feet behind the other, and he saw them until they passed out of the light from two street lamps near the branch into the shadow; that witness then turned and hearing two shots looked out again and saw one of them coming back into the light, staggering, and fell—this proved to be the deceased Brock, fatally shot as stated. With a view of showing that this was a deliberate and premeditated murder the State introduced a witness by the name of Will Gaddy, who testified that in July or August preceding the homicide, witness and deceased were sitting in front of a hardware store in Waynesville and prisoner walked by and turned, looking at the deceased. Two, three, or four minutes later Brock moved off and witness, having moved up near, and heard him say to another colored boy who was with him, "Yes, I will get the God-damned son of a bitch sooner or later." In support and corroboration of this position, the State later in the trial, proposed to prove by a witness Jim Smith that 30 months before the homicide, when deceased had made a serious assault on the old father of the prisoner, the latter was heard to use language about the deceased applying to him the same epithets and showing a deadly animosity towards him, the jury having been sent out to allow a discussion of the question, the court ruled that the proposed evidence was too remote and both the circumstance of the assault and the prisoner's language concerning it was excluded. In his charge to the jury, however, the court, in stating the claims and contentions of the State that this was a wilful and deliberate homicide, from a settled and long-cherished malice felt by prisoner towards the deceased, stated and referred to the fact that 30 months before the deceased had had trouble with the father of the prisoner in the course of which deceased had knocked down the older Love." To the statement and reference thereto prisoner duly excepted and, in our opinion, the exception must be sustained. Here was a prisoner on trial for his life and the sole question was: "Was this a deliberate murder prompted by malice long harbored towards the deceased, or was it a homicide on a sudden meeting and from an instantaneous impulse, and permitting also suggestions of a killing in self-defense? And on an issue of this supreme import, after excluding the proposed testimony of a serious assault by deceased on the witness' aged father 30 months before as being too remote, puts it to the jury

as a fact in evidence to show the origin of the prisoner's malice and as tending to support the State's contention that this was murder done of a deliberate and settled purpose. And when coupled, as it was in this portion of the charge, with the threat proved by the witness Gaddy that within six months before the prisoner was heard to say, supposedly of the deceased, "I will get the God-damned son of a bitch sooner or later," the fact of this fight with the father became of tremendous significance as tending to show an abiding malice towards the deceased, and its statement in the hearing of the jury after it had been excluded, should undoubtedly be held for reversible error. True, this feature of the charge was prefaced by the statement that it is the contention of the State, and we have numerous decisions to the effect, that if the court, in stating the contentions, commit an error, it is too late to except to it after verdict—but while the deduction from the facts was given as a contention of the State, the putting of the fact before the jury as sworn testimony where it had been excluded was the act of the judge and of a highly prejudicial kind and none of the decisions referred to go to the extent of disallowing an exception under such circumstances. Suppose the counsel for the prisoner had excepted and on discussion the judge had withdrawn the evidence referred to, this would only have served to emphasize the error and strengthen the lodgment it had necessarily made on the minds of the jury. Like an expression of opinion by the Court on the merits of the case, the harmful impression could not well be effaced, and in our opinion, should not be taken as waived because not presently excepted to. See *S. v. Cook,* 162 N. C., 586, and cases cited. Again it is insisted, for the State, that the evidence referred to in this portion of the charge is competent and therefore no harm has come to the prisoner in referring to it, but if this be conceded, in that aspect of the matter, there is error for the fact objected to was put before the jury in such a way and under such circumstances that gave the prisoner no opportunity of disproving it or cross-examining the witness who testified to it, it therefore violated the constitutional right of the prisoner to be confronted with the witnesses against him. The right of a defendant charged with crime to know the nature of the charge and to confront his accusers and the witnesses against him, has prominent place in our State Constitution, Article I, section 2, and appears also as the sixth of the first ten amendments adopted to the Constitution of the United States, and is universally recognized as of vital importance to the administration of well-ordered justice. *S. v. Dixon,* 185 N. C., 727; *S. v. Dowdy,* 145 N. C., 432-436. Speaking to the question in *S. v. Dowdy,* the Court said: "This right, of such supreme importance to the citizens, so essential to any proper and impartial administration of justice, should appeal most impressively to

the courts of this State, for North Carolina declined to adopt the Federal Constitution until the amendment by which it was guaranteed had been formulated by the Federal Congress and its adoption practically assured. It has, too, prominent place in our Bill of Rights, and this Court would never uphold or countenance any legislation or procedure by which it was destroyed or substantially impaired." Again it is contended, for the State, that the error, if any, is cured by the following which appears as a part of his Honor's charge: "If the jury shall find from the evidence that the prisoner had ill-feeling and malice towards the deceased and had formerly threatened the deceased, and if the jury shall further find from the evidence that the parties met accidentally upon the occasion of the fatal encounter and that the deceased suddenly advanced upon the prisoner, cursing him and threatening to 'fix him,' or words to that effect, and that the prisoner instantly thereupon shot and killed the deceased, the law would attribute the motive of the killing to the present provocation and not to the preëxisting malice, 'unless it so appeared from the circumstances of the affair.' " But this amounts to no more than an admonition to the jury to adopt the theory of a killing on a sudden impulse from present circumstances rather than attribute it to an antecedent malice, for the closing part of the charge "unless it so appears from the circumstances of the affair" clearly leaves to the jury whether the matter be decided one way or the other. This but adds to the significance of the error complained of in putting before the jury a fact of pregnant significance on that question, which had not been testified to by any witness.

For the error indicated the prisoner is entitled to have his cause heard before another jury, and it is so ordered.

New trial.

CLARK, C. J., dissenting: The prisoner was indicted and convicted of murder in the first degree of killing a white man. It is not controverted that there was ample evidence before the jury, if believed, to justify the verdict. The exception on which a new trial is asked is based upon the following facts: There was evidence that six months before the homicide the prisoner, in July or August of last year, when the deceased passed by him, said to a bystander and looking at the deceased, "I will get the God-damned son of a bitch sooner or later." There was evidence offered by the State that in the summer of 1920 there had been a previous difficulty between the father of the prisoner and the deceased, and that the prisoner had made a similar threat two years and a half before the trial, but the court had excluded it.

In the charge to the jury the court stated the contentions of the State, and among the contentions of the prisoner he said: "It is con-

tended that any trouble that may have occurred between Brock (the deceased) and Love's father had been thirty months before, and that George Love had nothing to do with it." Neither the prisoner nor the State made any exception to this recital at the time nor until after verdict.

It has been stated, too often to be now departed from, that any error in stating the contentions of the parties must be excepted to at the time, and if this is not done an exception cannot be taken after verdict. The following are a few among the very many cases that "an objection to the court's statement of the contentions of the parties cannot be first made after verdict": *S. v. Tyson,* 133 N. C., 692; *S. v. Davis,* 134 N. C., 633; *Phifer v. Comrs.,* 157 N. C., 150. "If a judge states a certain condition of affairs as being contended for by a party, when there is no evidence to support the contention, it is the duty of counsel to call the court's attention thereto." *Jeffress v. R. R.,* 158 N. C., 215.

This ruling that a failure to call the attention of the court, at the time, to any alleged error in stating the contention of the parties waives the objection, has been so often held, and it is so entirely without an exception, that it is unnecessary to cite the numerous and unbroken precedents which sustain the self-evident requirement in the due and just administration of the law. The courts cannot be governed by sentimental considerations urged by counsel who have lost out before a jury upon evidence and a charge not excepted to.

This is a plain, practical, well-settled rule of action.

The party who thinks himself prejudiced by any inadvertence or error in stating the contentions should make the exception at the time, and if he does not do so, it must be taken that he did not think himself prejudiced thereby, and if he does not do so at the time, so the judge can correct it, he will not be allowed to make an exception after verdict. To permit this would be eminently unfair to the State. The opportunity should be given the judge to correct an inadvertence (for such it must be) at the time, and if not, it must be taken that all exception was waived. This has been the uniform ruling of the Court, made uniformly and without any exception whatever, and should not now be departed from and for the first time in favor of this defendant. Upon the review of the whole evidence in this case, it would seem very clear that it could not possibly have had any effect upon the jury. If it had, notwithstanding that the failure to except had waived objection to the inadvertence, it is very certain that on an appeal to the presiding judge, who knew all the facts and circumstances much better than can be presented here, in the interest of justice, he would have set aside the verdict.

Upon the face of this record it seems clear that the jury had the whole case fairly and fully presented to them by his Honor's charge and have found their verdict upon ample evidence.

It is to the interest of justice that new trials should not be granted for immaterial matters or inadvertences which it is not shown could have had any effect upon the result.

The American Bar Association, headed by the *Chief Justice* of the United States, has issued à statement asking for more efficiency in the administration of justice, and nothing can more militate against this than the granting of new trials upon any inadvertence, or matters like this, which the counsel at the time did not deem was of sufficient importance to ask the court to correct, and which it must be taken that he would have promptly done if asked.

As an evidence of the insecurity of life in this country, caused by the granting of new trials or acquittals upon technical or merely sentimental reasons, it is pointed out that last year in the United States there were 15,000 homicides, and in this State in 1921 there were 246 according to the Bureau of Vital Statistics, and in 1922 there were 253, while in Great Britain, with 40 millions of people, there were less than 40. Indeed in 1922, as stated in the official report, of which we take judicial notice, it is returned that "in this State there were 298 deaths from typhoid fever and 253 homicides, and that while disease had decreased crimes had increased."

We know that as a matter of fact that so great is the dissatisfaction with the numerous new trials and miscarriages of justice, due to acquittals or new trials based often upon mere technicalities, crime has so much increased in this country that secret and unlawful organizations pervade the country and State to a large extent, and it is not inappropriate, but timely, that the courts should take notice of the warning of the American Bar Association and the *Chief Justice* that there is an "alarming and steadily growing disrespect and, indeed, hostility to the courts." These secret organizations for the protection of society can have as their cause only the apprehension of the public that the great and increasing volume of crime is due to the inefficiency of the courts, caused largely, if not altogether, by yielding to the importunities of counsel claiming every technicality as a defense, when, upon the law and the facts, the jury have found, beyond a reasonable doubt, that the defendant is guilty.

In this case the facts were fully developed, the prisoner was ably defended, and the inadvertence in stating a contention, which would have been corrected if called to the attention of the judge, should not be allowed, in my humble judgment, to give this prisoner a new trial where, upon the evidence, under a charge unexcepted to, the jury have

found that beyond a reasonable doubt the prisoner was guilty of felonious, malicious and premeditated murder.

Crime should be repressed by the orderly process of the courts and by the certainty of the infliction of punishment when the crime has been duly ascertained by the verdict of the jury, but society must be protected, and if the courts fail to do so we may expect the continuance of the lawless process by which the public may, and will, deem it necessary to protect themselves when the courts do not do so.

Homilies upon the evil effects of the repression of crime by secret and unlawful bodies of men will have no effect. The only remedy is the efficient and common-sense enforcement of the law by the courts, which are provided and supported at the expense of the public for the sole purpose that by the legal repression of crime, life and property may be made safe.

Among the many opinions which, without a single exception cite, approve and repeat the proposition that if the court recites the evidence or the contentions of the parties incorrectly, any objection must be made at the time so as to give the judge opportunity to correct it, and that otherwise the objection is waived, the following are the latest cases: *S. v. Cox,* 153 N. C., 638; *S. v. Blackwell,* 162 N. C., 684; *S. v. Fogleman,* 164 N. C., 461; *S. v. Cameron,* 166 N. C., 384; *Ferebee v. R. R.,* 167 N. C., 296; *Barefoot v. Lee,* 168 N. C., 90; *Lea v. Ins. Co.,* ibid., 478; *Ball v. McCormack,* 172 N. C., 682; *McMillan v. R. R., ibid.,* 853; *S. v. Merrick, ibid.,* 872; *S. v. Johnson, ibid.,* 925; *S. v. Burton, ibid.,* 942; *S. v. Martin,* 173 N. C., 810; *Muse v. Motor Co.,* 175 N. C., 471; *Mfg. Co. v. Bldg. Co.,* 177 N. C., 106; *Bradley v. Mfg. Co., ibid.,* 155; *Futch v. R. R.,* 178 N. C., 284; *Hale v. Rocky Mount Mills,* 186 N. C., 51; and there are many others to the same effect and not one to the contrary.

These are all uniform and unequivocal, and there is no reason why a special exemption from so absolutely settled a rule should be made in favor of this defendant. It is true that he is a colored man, indicted and found guilty of the murder of a white man, but there is not the slightest indication in the record or otherwise that he has not had a full, a fair and an impartial trial, and there is no reason why the special privilege of being exempted from so well-settled a principle and, indeed, so necessary a one in the due administration of the law, should be granted him. There is no indication that he has been prejudiced thereby. The presumption of law is in favor of the correctness of the ruling and the impartiality of the presiding judge and of the jury.