STATE OF NORTH CAROLINA v. WILLIE THOMAS

No. 699SC344

(Filed 23 July 1969)

1. **Homicide § 19— evidence competent on question of self-defense — deceased's reputation for peace and quiet**

   In support of his plea of self-defense, defendant in a homicide prosecution offered evidence of specific threats of violence towards defendant by deceased, and of specific acts and threats of violence by deceased towards defendant's daughter, the wife of deceased. *Held:* It was error to allow the State in rebuttal to offer testimony by deceased's employer that deceased never exhibited violent or vicious behavior during the employment and to offer evidence of the peaceful conduct of deceased on an occasion when threatened by the son of defendant, and of which defendant had no knowledge.

2. **Homicide § 19— evidence on self-defense — deceased as a violent man**

   On the question of the reasonableness of defendant's apprehension of

death or bodily harm upon his plea that he acted in self-defense, defendant was entitled to offer evidence that deceased was a violent and dangerous man, if such reputation was known to defendant, and to offer evidence of threats against defendant by deceased which were communicated to defendant.

**3. Homicide § 19— evidence on self-defense — deceased's reputation for peace and quiet**

   Where the defendant in a homicide prosecution makes an attack on the character of the deceased and thereby puts it in issue, the State in rebuttal may support its case by introducing evidence that deceased bore the reputation of being a man of peace and quiet, but such evidence must be in rebuttal and limited to the general reputation of deceased for peace and quiet.

APPEAL by defendant from *Carr, J.,* 16 December 1968 Session, VANCE Superior Court.

Defendant was charged in a bill of indictment with the capital felony of murder of his son-in-law, Walter Burwell. When the case was called for trial the solicitor for the State announced that he would not try the defendant on the first degree charge, but would ask for a conviction of second degree murder or manslaughter. Defendant entered a plea of not guilty.

Evidence for the State was limited to that of L. B. Faulkner, Vance County Sheriff, who talked to the defendant and visited the scene. The sheriff recalled that the night of 12 July 1968 was a very dark night and that a sprinkle of rain was starting to fall at about the time of the homicide which he estimated to be about 9:30 p.m. It was stipulated that about that time Walter Burwell, son-in-law of the defendant, died from a rifle bullet wound that penetrated the left-front shoulder of Burwell at an angle horizontal to the ground, with the body standing erect, and the bullet ranged downward into the heart. The defendant admitted that he fired the .22 rifle, an old gun he had had for some time.

On the night in question, a message was received from Clementine Burwell, daughter of the deceased, by William Odell Thomas (William), son of the defendant, at the defendant's home near Franklin County line. Clementine asked her uncle and grandfather to come to her house because her daddy was beating on her mother again and almost choking her to death. William, who had been sick, and the defendant jumped into the car and rode some eight miles to the home of Burwell, which was about one mile north of Henderson on Highway 39. Defendant took his rifle with him and loaded it with one shell while on the way to town. After going up a steep

bank in front of the house, defendant stepped on the porch and was met by Clementine who told him her daddy had almost choked her mother to death. Meanwhile, William had gone around back of the house and met Walter about 50 feet from the house walking toward it. When William asked, "Walter, what in the world is going on?" Walter replied, "None of your damned business," and then continued on toward the house. William kept walking on toward Walter Burwell's mother's house (which was behind Burwell's own home) looking for his sister, Beatrice.

By this time; defendant had come around back of the house and was standing near a screened-in porch attached to the rear of the house. Walter came toward him and defendant asked, "Walter, what on earth is wrong here tonight?" Walter replied, "None of your g. d. business," according to defendant, and then he immediately struck defendant in the forehead and knocked him back against the screen at the corner of the house. Defendant said "When he hit me, I fell and caught with my left hand up in the screen wire, and when I straightened up, I shot. I don't know which way I shot or nothing. I just fired the rifle . . . because I was afraid of him."

The sheriff's version of what was told him by defendant on direct examination by the solicitor was that Burwell struck him with his hand or his fist, he wasn't sure, and as soon as he straightened up, he took his rifle and shot him. The sheriff's notes did not reveal any profanity used against defendant by deceased.

After deceased was shot, William and defendant drove straight to George Bullock's cab stand which was on the edge of Henderson near Highway 39 North and asked Bullock to call the rescue squad to help Walter and take him to the hospital. Defendant said he thought he would do more harm than good by moving Walter or trying to help him. Defendant did not call the police station.

On this night Walter Burwell had assaulted his wife and threatened her life and she had had to run from the house with her children to escape her husband. She had gone to the police station to take out a warrant when her father arrived at her home.

After the defendant told Bullock to send the rescue squad for Walter, he told him that he was going to his home to see whether his daughter Beatrice had gotten to his house. Some difficulty was had with the car in which defendant was riding and he asked his son, Joe, to call Mr. Bullock and see if Walter had been carried to the hospital. Joe made the call and reported Walter was dead. Defendant then went back to George Bullock's where he met Sheriff Faulkner and Deputy Sheriff Mims in a few minutes.

At the time of his death, deceased was 40 years of age, 5'11" tall, and weighed 175 to 180 pounds.

At time of shooting, defendant was 71 years of age and suffered from high blood pressure and arthritis.

From a verdict of guilty of voluntary manslaughter, and judgment of imprisonment for a period of not less than eight nor more than twelve years, defendant appealed.

*Robert Morgan, Attorney General, by Harrison Lewis, Deputy Attorney General, and Claude W. Harris, Trial Attorney, for the State.*

*Sterling G. Gilliam, and James C. Cooper, Jr., for the defendant.*

BROCK, J.

[1] In support of his contention that he acted in self-defense, defendant offered evidence of specific threats of violence towards defendant by deceased, and of specific acts and threats of violence by deceased towards defendant's daughter (wife of deceased).

In rebuttal the State offered the testimony of Sparkwood Burwell, employer of deceased, and of Leonard Perry, Jr., a brother-in-law of deceased. By the testimony of these witnesses the State sought to show that deceased was a peaceful and nonviolent man.

After the witness Sparkwood Burwell had stated that he did not know anything about deceased's reputation in the community, he was allowed, over defendant's objection, to answer questions as follows:

"Q. Did you ever know him to show any temper or —

"A. I said presently he was, during the time he was my employee. He was working for me at the time this happened and he has never shown me no one second of violence or being a vicious man, don't he couldn't have worked for me.

"Q. Have you ever seen him display any violence towards his family?

"A. No Sir."

It not having been established that the witness had ever observed the deceased except while on the job, it seems obvious that the witness was not qualified to answer the questions, had they otherwise been proper inquiries. It would seem manifest that even a

vicious and violent man would not likely display such propensities to or in the presence of his employer.

Also, over defendant's objection, the witness Leonard Perry, Jr. was allowed to testify concerning the peaceful conduct of deceased on an occasion in 1961 when threatened by the son of defendant, and of which defendant had no knowledge.

Defendant's exceptions and assignments of error to the allowance of these questions and answers are well taken.

**[2]**    On the question of the reasonableness of defendant's apprehension of death or bodily harm upon his plea that he acted in self-defense, defendant was entitled to offer evidence that deceased was a violent and dangerous man, if such reputation was known to defendant. *State v. Morgan,* 245 N.C. 215, 95 S.E. 2d 507; *State v. Blackwell,* 162 N.C. 672, 78 S.E. 316; Stansbury, N.C. Evidence 2d, § 106. Also, for the same purpose, defendant was entitled to offer evidence of threats against defendant by deceased which were communicated to defendant. *State v. Rice,* 222 N.C. 634, 24 S.E. 2d 483; Stansbury, N.C. Evidence 2d, § 162a.

**[3]**    Where the defendant in a prosecution for homicide makes an attack on the character of the deceased and thereby puts it in issue, the State may, in rebuttal, support its case by introducing evidence that deceased bore the reputation of being a man of peace and quiet. Such evidence by the State must be in rebuttal and limited to the general reputation of the deceased for peace and quiet. *State v. Champion,* 222 N.C. 160, 22 S.E. 2d 232; *Nance v. Fike,* 244 N.C. 368, 93 S.E. 2d 443; Stansbury, N.C. Evidence 2d, § 106; Annot., 34 A.L.R. 2d 451 (1954).

The State was allowed impermissible latitude in this case.

New trial.

CAMPBELL and MORRIS, JJ., concur.